ANTHONY DIJOHN AND GERRI DIJOHN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
DiJohn v. Commissioner
Docket No. 5778-88
United States Tax Court
T.C. Memo 1991-484; 1991 Tax Ct. Memo LEXIS 533; 62 T.C.M. (CCH) 868; T.C.M. (RIA) 91484; September 30, 1991, Filed *533 Decision will be entered for the respondent. Michael K. McBeath, for the petitioners. J. Michal Nathan, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACTS AND OPINION Respondent determined a deficiency in petitioners' Federal income tax liability for 1981 in the amount of $ 5,216. Respondent also determined additions to tax under section 6653(a)(1) [1] in the amount of $ 261 and under section 6653(a)(2) in an amount to be determined (50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations). The primary issue to be decided is whether certain evidence should be excluded because respondent, in the course of his deficiency determinations, made misrepresentations to petitioner Anthony DiJohn's employer. FINDINGS OF FACT
*534 Some of the facts have been stipulated and are so found. Petitioners resided in Incline Village, Nevada, at the time they filed their petition in this case. Hereinafter, petitioner refers only to Anthony DiJohn. During 1981, petitioner was employed as a craps dealer by Desert Palace, Inc., d/b/a Caesars Palace (Caesars) in Las Vegas, Nevada. In addition to receiving a salary from Caesars, petitioner received tips, or tokes, [2] from players at the craps tables. Petitioner did not keep contemporaneous records of tokes he received. On September 3, 1981, respondent's revenue agent issued a summons to Caesars requesting the names, addresses, and social security numbers of all current craps dealers and certain other employees. Caesars refused to comply with the summons. On September 23, 1981, under the pretense of a payroll tax audit, respondent's representatives served on Caesars an Information *535 Document Request (IDR), requesting the names, addresses, and social security numbers of, among others, all of Caesars' craps dealers, and a copy of Caesars' June 30, 1981, payroll tax return. Caesars complied with the IDR with the understanding that respondent intended to pursue an employment tax audit of Caesars. Respondent acknowledges that at the time the summons was issued he had no intention of conducting a payroll tax audit of Caesars. On October 15, 1981, respondent mailed to petitioner and to other craps dealers and employees of Caesars a letter describing a toke compliance program (relating to the Federal income tax liabilities of the individual dealers and other casino employees), stating that the identity of Caesars' dealers and other employees had been obtained through a payroll tax audit of Caesars, and stating that information requested in the letter would be used in conducting the toke compliance program and in determining Caesar's correct payroll tax liability. At the time this letter was mailed, respondent was not auditing the payroll tax returns of Caesars, and respondent had no intention of doing so in the foreseeable future. Under respondent's toke compliance *536 program, casino dealers who agreed to report, for 1982 and subsequent years, their toke income accurately and in accordance with certain guidelines, were told that their Federal income tax returns for years prior to 1982 would not be audited by respondent. Petitioner did not choose to participate in this program. A significant number of Caesars' blackjack dealers participated in respondent's toke compliance program and reported to respondent their daily toke income for 1982. From this information, respondent calculated that the average hourly rate of toke income received by Caesars' blackjack dealers was $ 13.75. Based on additional information, this rate was lowered to $ 13.10. Respondent was not able to gather significant direct information concerning the toke income received by Caesars' craps dealers for 1981 or 1982. Based, however, on seizures by respondent of actual tokes from various blackjack and craps dealers at Caesars, respondent calculated that Caesars' craps dealers generally received 87 percent of the amount of toke income received by Caesars' blackjack dealers. This percentage was then applied to the 1982 hourly toke rate of $ 13.10 for blackjack dealers, resulting *537 in an hourly toke rate for craps dealers of $ 11.40, which rate was used in respondent's determination of the toke income petitioner received in 1981. On September 15, 1982, respondent issued an administrative summons to Caesars requesting employment information about its employees whose names had been obtained through the IDR issued in September of 1981. On September 29, 1982, Caesars complied with the summons and supplied, among other things, the following information concerning petitioner for the year 1981: Hours worked by petitioner:
1,838
Tokes reported to Caesars by petitioner:
-0-
Wages paid to petitioner:
$ 11,017
On their joint Federal income tax return for 1981, petitioners reported wages received from Caesars of $ 11,017 and toke income of $ 7,424. On audit, using the $ 13.75 hourly toke rate, respondent determined that petitioner received additional taxable toke income of $ 17,848. Due to the subsequent modification of the rate as described above, respondent now asserts that the correct hourly toke rate is $ 11.40. OPINION The exclusionary rule generally has been used only in criminal cases to prevent the use of illegally obtained evidence, and then *538 only when a direct violation of the defendant's constitutional rights has occurred. See discussion in . Courts have been reluctant to apply the exclusionary rule in civil cases, especially where it seems unlikely that the deterrent effect of the rule would outweigh the societal cost of the exclusion. See ; (Court reviewed); . Petitioners contend that, in this case, respondent's representatives obtained evidence in violation of section 7609(f) and in violation of petitioner's constitutional rights, and therefore that the evidence used by respondent in making his deficiency determination against petitioner should be excluded and respondent's deficiency determination should not be sustained. This Court has stated that "it would be stretching the exclusionary rule beyond reasonable bounds to hold in every case in which the identity of an individual is somehow illegally obtained that all information subsequently acquired must be suppressed." , affd. . In this case, respondent's representatives clearly made misrepresentations to petitioner's employer in order to obtain petitioner's name, address, and social security number. Petitioners, however, have not shown that respondent could not have obtained such information through other means. Indeed, it appears clear that respondent would have been able to obtain the same information by complying with the provisions of section 7609(f). While we do not condone respondent's misrepresentations, we do not believe that exclusion of the information obtained through the IDR is the appropriate remedy. We hold that the evidence in question is admissible. When taxpayers fail to keep records or to keep adequate records of income, respondent may calculate the taxpayers' income in any manner that clearly reflects the income. Sec. 446; . Respondent in this case has used a reasonable method of calculating the amount of petitioner's toke income for the year in issue. We sustain respondent's determination of petitioners' tax liability for 1981. Respondent's determination of additions to *540 tax under section 6653(a)(1) and (2) is presumptively correct, and the burden is on petitioners to prove that they were not negligent. Rule 142; , affg. in part and revg. in part a Memorandum Opinion of this Court; . Petitioners have not offered any evidence concerning the additions to tax. We sustain the additions to tax as determined by respondent. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Tips received by dealers are called tokes because they are usually received in the form of casino chips or tokens.↩